UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
GLOBAL AEROSPACE, INC., f/k/a ASSOCIATED
AVIATION UNDERWRITERS, INC. and FEDERAL
INSURANCE COMPANY,

                    Plaintiffs,

              -against-                                      06 Civ. 7104 (LAK)

HARTFORD FIRE INSURANCE COMPANY and
HARTFORD ACCIDENT AND INDEMNITY COMPANY,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

        Appearances:

                Katherine B. Posner
                CONDON & FORSYTH, LLP
                *Attorney for Plaintiffs*

                Michael A. Troisi
                Michael P. Versichelli
                RIVKIN RADLER, LLP
                *Attorneys for Defendants*

Lewis A. Kaplan, *District Judge.*

        This action arises out of a dispute between primary and excess insurance carriers over

the primary carrier's handling of a workers' compensation claim.

        Defendants ("Hartford") were the workers' compensation carrier for the Flying Tiger

Line, Inc. ("Flying Tiger") under a policy with a $300,000 limit on liability.  Plaintiffs (hereinafter

2

"Global") insured for losses in excess of Hartford's $300,000 of coverage.  Global's central claim

is that Hartford breached an agreement between the parties by accelerating and increasing Global's

payment obligations to workers' compensation claimant William Bond.

Global originally asserted claims against Hartford for  (1) declaratory judgment, (2)

breach of contract, (3) breach of fiduciary duty, (4) negligent misrepresentation and (5) promissory

estoppel.  Hartford moved for summary judgment dismissing each claim.  On the same day, Global

moved to amend its complaint to add claims for equitable subgrogation and implied indemnity and

to seek reimbursement of all workers' compensation payments made by Global to Bond.  It contends

that the amendment is warranted by information revealed during discovery.  Both motions are now

before the Court.

*Facts*

On March 10, 1986, Flying Tiger pilot William Bond a sustained an injury while

descending a Boeing 747.[1]  Flying Tiger had workers' compensation coverage under a United States

Aviation Underwriters Workers Compensation and Employers Liability Policy issued by Hartford,

a United States Aviation Underwriters member company.

A collective bargaining agreement ("CBA") between Flying Tiger and the Airline

Pilots Association governed certain terms of Bond's employment.  The pertinent section of provides:

> "**Section 16 – International Workers' Compensation Benefits**
> The Company will provide Workers' Compensation Benefits for
> pilots in International operations in amounts not less than those
> prescribed by the Longshoremen's and Harbor Worker's

---

[1]

Federal Express ("FedEx") acquired Flying Tiger in August 1989.

3

Compensation Act, as amended, or the Workers' Compensation Law
of the State of California, whichever act provides the higher
benefits."[2]

In addition to workers' compensation, the Hartford Policy provided $300,000 of

coverage under an Excess Voluntary Compensation Endorsement (the "Endorsement") to fulfill

Flying Tiger's contractual obligation to compensate injured pilots at rates exceeding those available

under the New York Workers' Compensation Law.  The Endorsement provides:

"We will pay the difference between the amount the employee
receives under the benefits of the workers compensation law and the
benefits the employee would have received had the claim fallen under
the jurisdiction and benefits of the 'United States Longshoreman's
and Harbor Workers' Compensation Act.'   However, under no
circumstances shall we pay more than $300,000 for any one accident
regardless of the number of employees injured."[3]

Paragraph E of the Endorsement provided that "[i]f the persons entitled to the benefits of this

insurance make a recovery from others, they must reimburse us for benefits we paid them."[4]

Global provided Flying Tiger with excess insurance coverage for amounts over

$300,000 that Flying Tiger might be required to pay pursuant to Section 16 of the CBA.  Thus,

Hartford was liable for the first $300,000 of voluntary compensation and Global for any amount

above that.

---

[2]   Joint Pretrial Order ¶ 2.

[3]   *Id.* at ¶ 5.

[4]   Williamson Aff. ¶ 5, Exh. A.

4

*Bond's Worker's Compensation Claim*

After his injury, Bond brought a worker's compensation claim before the New York Workers' Compensation Board.  Hartford, as primary insurer, represented Flying Tiger.  Hartford began making payments to Bond for the period beginning March 10, 1986, the date of his accident.  The payments had two components: what Bond was entitled to under the New York Workers' Compensation Law and what he was entitled to under Flying Tiger's contractual obligation to pay him at the higher rate set by the LHWCA.[5]

*The Boeing Settlement and Hartford's Letters*

Bond brought also a personal injury action against the Boeing Company, which he ultimately settled in 1989 for $650,000,[6] contingent upon Hartford's waiver of its workers' compensation lien.[7]  By the time of the settlement, Hartford had paid Bond $94,047.92 in total benefits, $55,197.92 of which represented voluntary supplemental compensation payments.  That meant that Hartford remained obligated to pay Bond $244,802.08 of the $300,000 worth of voluntary supplemental coverage before Global's excess coverage obligation would kick in.

In exchange for waiving its lien, Hartford sought to suspend payments to Bond in

---

[5]
    Initially, the statutory portion of the compensation payments made to Bond was $300 per week, representing the statutory compensation for temporary total disability.  On February 15, 1988, the statutory amount was reduced to $150 per week, representing the amount required by statute for partial disability.  Joint Pretrial Order ¶ 10.

[6]
    Captioned *William C. Bond v. Boeing Company*, Index No. 87 CV 0174 (hereinafter the "*Boeing*" action).

[7]
    As noted above, Hartford was entitled to a lien recovery under Paragraph E of the Compensation Endorsement.

5

order to get a credit for the amount it had paid him already.  While the parties disagree over their precise nature, discussions took place among Hartford, Global and Bond concerning that issue and the scheduling of future compensation  payments to Bond once that Hartford's credit for past payments was exhausted.

On March 31, 1989, Hartford's attorney, Martin Krutzel, wrote two letters to Bond's attorney, Steven C. Marks, summarizing what the parties had worked out.  The first informed Marks that Hartford would suspend compensation payments to Bond from March 20, 1989 for approximately 12.79 because of the credit to which Hartford claimed it was entitled by virtue of Bond's recovery from the *Boeing* settlement.[8]  Krutzel wrote that Hartford would recommence payments to Bond at the rate of $595.24 per week after the 12.79 years elapsed.  Those benefits would continue for as long as Bond was entitled.[9]  The second letter provided Hartford's consent to Bond's settlement with *Boeing*.[10]

Also on March 31, 1989, Krutzel wrote a letter to Global's attorney, Robert Hirsch, (the "Insurers' Letter Agreement") enclosing copies of the two letters Krutzel sent to Bond's attorney that same day.[11]  Krutzel informed Hirsch that "[the] purpose of this correspondence is to memorialize the agreement between USAU [Hartford], the primary Workers' Compensation carrier

---

[8]  This figure was based on the fact that Bond's net recovery under the *Boeing* settlement was $397,131.35.

[9]  Posner Dec. Exh. 6.

[10]  Posner Dec. Ex. 7.

[11]  *Id.* Exh. 5.

and AAU, responsible for the payment of excess benefits."[12]   Krutzel then laid out Hartford's

calculations of the future payments to Bond in the following manner:

> "Assuming that no further compensation payments are made to
> Captain Bond subsequent to March 20, 1989, after the
> recommencement of payments in 12.79 years, the Hartford Insurance
> Co. will continue to pay the claimant $595.24 per week for an
> additional 10.54 years.  Thereafter the Hartford's rate will be reduced
> to the New York statutory maximum of $150.00 and it is our
> understanding with you that the AAU will at that point commence
> payment to the claimant in the amount of $445.24 per week,
> representing that portion of the overall rate of $595.24 consisting of
> voluntary excess benefits."[13]

*Bond's Request for COLA*

In July 1998 a dispute arose between Bond and Hartford.  Although the New York

State Workers' Compensation Board classified Bond as permanently partially disabled,[14] the Social

Security Administration ("SSA") subsequently classified Bond as permanently totally disabled.[15]

In light of the SSA classification, Bond claimed that he was entitled to a retroactive and continuing

cost of living adjustment ("COLA") to his weekly $594.24 payment under the LHWCA.  Bond

claimed also that, given these retroactive payments, Hartford should have recommenced paying him

---

[12]
    *Id.*

[13]
    Posner Dec. Exh. 5.

[14]
    On August 11, 1989, the New York Worker's Compensation Board determined that Bond
    was to continue to be classified as having a permanent partial disability.  Three months later
    the Board closed Bond's case and made all temporary rates permanent.

[15]
    Although Global disputes whether the SSA classification entitled Bond to COLA, it does
    not dispute the actual SSA determination.

benefits earlier than outlined in the Krutzel letters.[16]

Hartford and Bond debated  the issue from 1998 through 2001.  Hartford asserts that it ultimately agreed to Bond's request after receiving from Bond proof of the SSA's determination. Under the LHWCA, COLAs are required for anyone determined to have a permanent total disability.[17]  Hartford contends that it interpreted the SSA's standard for total disability to be more stringent than that of the LHWCA, leading it to conclude that if Bond were permanently totally disabled under the SSA standard, he necessarily was totally disabled under the LHWCA.  Hartford thus concluded that Bond was entitled to COLA under the LHWCA.

Accordingly, on or about February 14, 2002, Hartford resumed its compensation payments to Bond earlier than anticipated, issuing a check for the period of December 11, 2001 through February 25, 2002 at the rate of $595.24 per week.  Hartford continued paying Bond at that rate through May 24, 2002.   Then, on or about July 1, 2002, Hartford paid Bond a lump sum of $132,504.02.  The amount represented a retroactive payment for the difference between the weekly rate of $595.24 and the escalating maximum compensation rates, with COLA, paid to persons adjudged to have a permanent, total disability whose claims are governed by LHWCA.[18]

Hartford thereafter made bi-weekly compensation payments to Bond for the maximum rate payable under the LHWCA, with annual COLA, until it reached its contractual cap of  $300,000. In September 2004, Hartford informed FedEx, which had acquired Flying Tiger, that its payments

---

[16] Joint Pretrial Order ¶ 19.

[17] 33 U.S.C. §§ 910(f)(1), (h).

[18] The retroactive payment covered the period from May 16, 1999 through July 1, 2002.

8

under the Endorsement would reach the $300,000 limit in December 2004 and that Hartford's payments to Bond then would fall to $150 per week, representing the statutory amount due under the New York Workers' Compensation Law.

Hartford continues to pay Bond $150 weekly.  Global began making weekly excess payments to Bond, including COLA, in January 2005 and continues to make them.

*Global's Reaction*

Global asserts that it repeatedly asked to meet with Hartford to discuss its concerns over the handling of Bond's claim, but that Hartford refused.[19]  It apparently took no other action to challenge its obligation to pay COLA until it commenced this lawsuit on September 15, 2006 – all while it continued paying Bond under the excess policy.

*Discussion*

I.      *The Motion for Leave to Amend*

Global moves to amend the complaint to add new claims for equitable subrogation and implied indemnity based upon deposition testimony by Hartford witness Stephen Williamson.

A party may amend a pleading once, as of right, before a responsive pleading is served.  Thereafter, it may amend only on consent of the parties or by leave of the court.[20]  Where, however, a motion for leave to amend is made after the time set forth in a court scheduling order,

---

[19]      Meehan Aff. ¶¶ 24-25.

[20]      *See* FED. R. CIV. P. 15(a).

9

a court must consider the motion under Rule 16(b)'s more stringent "good cause" standard.[21]  "Thus, where parties seek leave to amend after a scheduling order has been entered, the court shall not allow the pleadings to be amended except upon showing of good cause."[22]  A finding of good cause depends on the diligence of the moving party.[23]

Global filed its complaint on September 15, 2006.  On November 30, 2006, the parties consented to a court approved scheduling order.  That order, as amended, provided that there would be no amendments to the pleadings after March 23, 2007, and required completion of discovery by December 14, 2007.

On February 8, 2008, the parties filed the joint pretrial order, Hartford moved for summary judgment dismissing the complaint, and Global moved for leave to amend its complaint.

Global rests its application for leave on the contention that its new claims are based on deposition testimony elicited from Hartford's Stephen Williamson during the session of his deposition conducted on August 1, 2007.  Yet Global did not seek leave to amend in light of this allegedly new evidence until six months later, on February 8, 2008 – the same date on which Hartford filed for summary judgment.  The only reason tendered for the delay is that Williamson's deposition was not completed until February 5, 2008[24] and Global wanted to make sure he would

---

[21]

   *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000).

[22]

   *Harriman v. United States*, 2004 U.S. Dist. LEXIS 9713, 93 A.F.T.R.2d (RIA) 2302, 2302 (citing *Grochowski v. Phoenix Constr.*, 318 F.3d 80 (2d Cir. 2003)).

[23]

   *Parker*, 204 F.3d at 340.

[24]

   The parties mutually agreed to the deposition schedule that resulted in Williamson's deposition beginning on August 1, 2007 and concluding on February 5, 2008.  That any

page number
10

keep to his earlier testimony before seeking leave to amend.

Global's position is unconvincing.  It had Williamson's supposedly groundbreaking testimony for six months prior to raising the new claims.  The proper time to seek leave to amend would have been when it received that information.  There is no evidence that Williamson was even asked about the "new" subject when the deposition was completed in 2008.  Global has not shown good cause as to why leave to amend should be granted at this late stage.

It is worth noting also that there is great doubt as to whether the Williamson testimony that Global relies upon actually disclosed anything new.  Global maintains that Williamson revealed for the first time that Hartford "no longer treated the Bond claim as a New York State Workers' Compensation Claim with a contractual obligation to pay additional amounts."[25]  Instead, according to Global's reading, Hartford "began treating the claim as a federal workers' compensation claim governed by the LHWCA."[26]  Based on this supposed bombshell, Global now seeks to avoid any liability under its excess policy on the theory that if Bond's entire claim is really a federal claim adjudicated under federal law, then it is covered by Hartford's primary policy only and not by the excess policy.  It therefore seeks a full refund of all the benefits it has paid to Bond and a declaration that Hartford, as primary insurer, is solely liable for all compensation payments to Bond.

---

delay in the deposition resulted from Global's "deference" to Hartford, as Global maintains, is immaterial to the Court's conclusion because there is no dispute that Global had the supposedly new testimony from Williamson on August 1, 2007 – six months prior to its motion for leave to amend.

[25]

Pls.' Br. in Support of Motion to Amend at 11.

[26]

*Id.*

Global's argument is based on a selective reading of Williamson's statements rather than evidence of any real shift by Hartford.  While Bond's workers' compensation claim fell under the New York State Workers' Compensation Law, Hartford always has been contractually obligated to pay Bond excess benefits in line with the LHWCA, a federal statute.  Thus, as is clear throughout the record, Bond's compensation include a federal component – the LHWCA – as benchmark  even though his workers' compensation claim itself was adjudicated under state law.  Global's proposed new claims thus ignore not only the entire record but the rest of Williamson's testimony clarifying precisely this point.[27]

As is evident throughout, Global's real dispute is with how Hartford interpreted its contractual obligation.  Specifically, Global does not agree that Hartford was obligated to pay COLA to Bond based on the SSA determination.  To argue now, based on a few largely out of context statements, that Hartford at some point came to view Bond's claim as a federal worker's compensation claim borders on the nonsensical.

Accordingly, Global's motion for leave to amend its complaint is denied.


II.     *Hartford's Summary Judgment Motion*

A motion for summary judgment will be granted only if the moving party shows that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.[28]  In deciding a motion for summary judgment, a court must resolve all ambiguities and make all

---

[27]     *See* Williamson Dep., Troisi Dec., Exh. I at 300-01.

[28]     *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 (2d Cir. 2008); see also FED. R. CIV. P. 56(c).

12

reasonable inferences in favor of the nonmoving party.[29]  Where the burden of proof at trial would

fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence

to go to the trier of fact on an essential element of the nonmovant's claim.[30]  In that event, the

nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of

fact for trial in order to avoid summary judgment.[31]


A.     *Breach of Contract*

Under New York law,[32] an action for breach of contract requires proof of (1) the

existence of a contract, (2) plaintiff's performance of the contract, (3) defendant's breach of the

contract and (4) damages caused by the breach.[33]

Global contends that Hartford breached the Insurers' Letter Agreement by unilaterally

agreeing to pay Bond COLA.  Hartford challenges the purported agreement on several grounds -

from the alleged lack of privity to the adequacy of consideration offered by Global.  To be sure,

colorable disputes may exist about certain of these issues.  Indeed, Hartford's contention that the

Insurers' Letter Agreement was no agreement at all, but served merely to document "Hartford's

understanding of the parties' respective payment obligations to Bond once the credit holiday

---

[29]
    *See Anderson*, 477 U.S. at 255.

[30]
    *Virgin Atl. Airways v. British Airways Plc*, 257 F.3d 256, 273  (2d Cir. 2001).

[31]
    *Id*.

[32]
    The parties agree that New York law applies in this action.

[33]
    *See e.g.*, *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994).

13

expired,"[34] is undermined by the letter itself, which states that "the purpose of this correspondence

is to memorialize the agreement" between Hartford and Global as the primary and excess carriers.[35]

But none of these issues ultimately is material.  For Global's position would lack

merit even if the Insurers' Letter Agreement were binding.  The Insurers' Letter Agreement expressly

contemplated the possibility of further payments to Bond.  Indeed, the letter states that the payment

schedule would be followed "[a]ssuming no further compensation payments are made to Captain

Bond."[36]  To read the agreement as unambiguously barring the possibility of a change in Bond's

status necessitating increased payments would seem to render the "future compensation" caveat

meaningless.

B.    Breach of Fiduciary Duty

Global contends that Hartford breached a fiduciary duty owed to Global by granting

COLA to Bond.  Hartford denies the existence of such a duty and, in any case, denies any breach.

There are circumstances in which primary insurers owe a fiduciary duty to excess

insurers.[37]  It is not necessary, however, for this Court to decide whether such a duty exists in these

---

[34]

Defs.' Br. at 22.

[35]

Posner Decl. Exh. 5.

[36]

*Id.*  While the possibility of COLA were not specifically addressed in the letter, they certainly were not precluded by the broad "further compensation" language.

[37]

*See e.g. Hartford Acc. and Indem. Co. v. Michigan Mut. Ins. Co.*, 93 A.D.2d 337, 442, 462 N.Y.S.2d 175, 178 (1st  Dep't 1983) in which the Appellate Division held that a "primary insurer "acts as a fiduciary [to the excess insurer] and is held to an exacting standard of utmost good faith."

14

circumstances because it is clear that even if such a duty did exist, Global could not demonstrate its breach.

The cases recognizing a duty of good faith owed to excess carriers by primary carriers make clear that Global would be required to demonstrate that Hartford showed a "gross disregard" for its interest.[38]  Such a showing requires proof of "deliberate or reckless failure to place on equal footing the interests of plaintiff with its own interests."[39]  In the settlement refusal context, the failure can be demonstrated by a "pattern of behavior evincing a conscious or knowing indifference to the probability that an excess insurer would be held personally accountable for a large judgment if a settlement offer within the policy limits were not accepted."[40]

The record here comes nowhere close to meeting this standard.  Indeed, Global's central piece of evidence that Hartford acted only in its own self-interest by granting COLA to Bond is a single diary entry from a claims adjuster recorded in Hartford's central case management system on September 10, 1999.  The entry states:

> "Compensable Claim - clmt settled his third party, we are taking credit for this should be picking up payments in 12/21 - and will cont pmt up to $500,000 at which time our payments stop and the employer picks up payments – payment is in line with Long Shore payments but not a Long Shore claim – rate were est at hearing and now clmt is questioning if he should receive the yearly cost of living increase that Long Shore claimant receive, file ... – *it is really a moot*

---

[38]   *Fed. Ins. Co.,* 158 F. Supp. 2d at 294.  *See also Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 399 (2d Cir. 2000) (citing *Pavia v. State Farm Mut. Automobile Ins. Co.*, 82 N.Y.2d 445, 453, 605 N.Y.S.2d 208, 211 (1993).

[39]   *Id.* at 294-95.

[40]   *Id.*

>*point for us as we have a cap on liability* – we will up reserves in
>09/20 if clmt is still due benefits claimant has to prove he is not
>employed – and due benefits ... plan – keep file open on a 90 day
>diary until benefits are due claimant ... reserve reserve is set for paid
>to date rounded off to nearest dollar – it will remain at this until date
>for benefits start 12/11/200 at which time reserves will be addressed
>the above is accurate as payments not due for two years anything
>could happen in this time period."[41]

This does not raise a genuine issue of material fact.  The entry was made over *two and a half years* before Hartford acceded to Bond's request for COLA and prior to Hartford's receipt from Bond of the SSA's determination that he was permanently totally disabled.  Furthermore, the decision to grant Bond COLA was made not by the adjuster who wrote this notation, but by a claims supervisor.  Global offers no plausible explanation as to what self-interest Hartford advanced by resisting the COLA issue for nearly three years before deciding that it was in its self-interest to accede to Bond's demands.  There is also no meaningful response to or proof challenging Hartford's assertion that it changed its position on Bond's COLA based upon its receipt of proof from Bond of the SSA determination and its belief that it was contractually obligated to make those payments.

Finally, even assuming it were true, as Global asserts, that Hartford was incorrect that it was obligated to pay Bond COLA in light of the SSA's determination, such a mistake by Hartford at most would have been negligent.  The cases recognizing a duty between primary and excess insurers are clear that "the duty of good faith is not breached by an insurer's mistake in judgment or negligence."[42]  And so, while there might be a colorable dispute over whether Hartford's conclusion that the SSA ruling entitled Bond to increased benefits under the LHCWA, there is not a shred of

---

[41]       Posner Dec. Exh. 11 (emphasis added).

[42]       *Fed. Ins. Co.* v. Liberty Mut. Ins. Co., 158 F. Supp. 2d 290

evidence pointing to any recklessness on Hartford's part in reaching that decision.

Hence, under the LHWCA, cost of living adjustments are required for anyone determined to have a permanent total disability.[43]   Under the Excess Voluntary Compensation Endorsement, Hartford was required to pay the difference between the amount Bond received under the New York Worker's Compensation law and the amount he would have received had his claim fallen under the LHWCA.   Hartford interpreted the SSA's standard for total disability to be more stringent than those of the LHWCA.   This led to the conclusion that if Bond was ruled permanently totally disabled by the SSA, he perforce met the LHWCA's lower standard.   Hartford thus concluded that Bond was entitled to COLA under the LHWCA.   That Global reached a different conclusion does not make Hartford's conclusion a reckless one; far from it.

At the end of the day, it appears that Global has sought to transform the facts underlying its breach of contract claim into an additional cause of action for breach of fiduciary duty. Unfortunately, Global simply does not have the proof to come close to meeting the bad faith standard in this context.   Accordingly, this claim is without merit.

### C.    Negligent Misrepresentation

Global's fourth claim for relief seeks recovery on a theory of negligent misrepresentation for Hartford's statements in the 1989 letters about the timing and amount of future compensation payments to Bond.[44]   Global claims it relied on these statements in return for its consent to the *Boeing* settlement.

---

[43]

33 U.S.C. §§ 910(f)(1), (h).

[44]

Pls.' Br. At 20-21.

The elements of negligent misrepresentation in New York are that "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment."[45]  The alleged misrepresentation must be factual in nature and not promissory or relating to future events that might never come to fruition.[46]

Global fails at the threshold.  The letters reflect the parties' understanding at a particular point in time.  As noted above, while COLA was not specifically mentioned in any of the letters, the Insurers Letter Agreement explicitly contemplated the possibility of further payments to Bond that might alter the timing and amount of payments outlined in the letter.  Hartford's decision to pay COLA, based on new evidence of his disability status presented by Bond years after the 1989 letters, recognized Bond's right to just such a further payment.  It did not render any statement in the 1989 letters false.

In its brief, Global maintains that Hartford "assured Global that it was treating the Bond claim as a New York workers' compensation claim, in which the New York Workers' Compensation Board determined that Bond was permanently, partially disabled, and that it was treating the enhanced benefits as a contractual obligation for which the maximum rate under the LHWCA in effect on the date of loss serves as a benchmark."  The letters do not actually say this.

---

[45] *Hydro Investors, Inc. v. Trafalgar Power, Inc.*, 227 F.3d 8, 20-21 (2d Cir. 2000) (internal citations omitted).

[46] *Id.*

18

But the real problem for Global is that there would have been nothing false about such a statement. Hartford treated the claim precisely this way.  Again, what Global really objects to is Hartford's conclusion that it was required to pay Bond COLA to satisfy its contractual obligation under the Voluntary Endorsement.  Whatever the merits of that disagreement, it does not render false any statement in Hartford's letters.

Global fails also to meet the reasonable reliance requirement – a failure that is itself grounds for summary judgment.  Without pointing to any specific facts, Global contends that "the record in this case establishes that Global did, in fact, rely on such representations to its detriment."[47] Indeed, Global offers no admissible evidence of detrimental reliance – only vague generalities about what steps it might have taken absent Hartford's alleged promise.[48]  Indeed, there is no evidence that, as Global's brief asserts, it forwent making a separate contract with Bond or demanding inclusion in the March 31, 1989 letter agreement between Hartford and Bond.  Without any evidentiary support aside from a list of hypothetical actions it might have taken, Global cannot meet the reliance requirement.

Accordingly, Global's negligent misrepresentation claim is without merit.


D.      *Promissory Estoppel*

Global's final claim for relief is for promissory estoppel on the theory that Hartford's payment of COLA to Bond violated a clear and unambiguous promise in the Insurers' Letter

---

[47]      Pls.' Br. at 21.

[48]      *See id.*

19

Agreement.  Establishing a claim for promissory estoppel requires "(1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance on that promise; and (3) injury to the relying party as a result of the reliance."[49]

Global cannot meet this burden.  First, the Insurer's Letter Agreement contains no clear and unambiguous promise by Hartford that it would not pay COLA to Bond.  As previously discussed, while silent as to COLA, the letter explicitly contemplates the possibility of "future payments" to Bond that might alter the payment schedule that is the subject of the letter.

Second, aside from the assertion that it relied on the purported "promise" of immutable rates for Bond in the Insurers' Letter Agreement, Global provides no evidence of such reliance. And even if it had adduced evidence of reliance that reliance would not have been reasonable given that the letter's contemplation of the possibility of future payments to Bond.

---

[49] *Cyberchron Corp. v. Calldata Sys. Dev.*, 47 F.3d 39, 44 (2d Cir. 1995).

*Conclusion*

For the foregoing reasons, plaintiffs' motion for leave to amend the complaint

[Docket item 41] is denied.  Defendants' motion for summary judgment dismissing the complaint

[Docket item 33] is granted.


SO ORDERED.

Dated:          January 13, 2009


_____
                              Lewis A. Kaplan
                    United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)